UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TERRI L. SPROUL,<br><br>                    Plaintiff,<br><br>  vs.<br><br>MICHAEL J. ASTRUE, Commissioner of Social Security,<br><br>                    Defendant. | CASE NO. 11-cv-1000 – IEG (BLM)<br><br>ORDER:<br><br>(1) GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, [Doc. No. 12]; and<br><br>(2) DENYING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT, [Doc. No. 15]. |

Currently before the Court is Plaintiff's motion for summary judgment and Defendant's cross-motion for summary judgment. Having considered the parties' arguments, and for the reasons set forth below, the Court **GRANTS** Plaintiff's motion and **DENIES** Defendant's cross-motion.

## BACKGROUND

Plaintiff Terri L. Sproul alleges disability due to fibromyalgia, severe joint pain in both feet, anxiety, and depression. She was 44 years old as of December 31, 2010—the date she last met the insured status requirements under the Social Security Act ("SSA"). Ms. Sproul completed twelve grades of education, but never received a high school diploma or a GED. Prior to the onset of the medical conditions that form the basis of her disability request, she was a property manager of multiple-unit buildings from 1994 to 2004, and a dishwasher at a local restaurant for about six months afterwards. She also worked part-time teaching scrapbooking techniques.

Ms. Sproul filed an application for disability insurance benefits in November 2006, alleging a disability onset date of September 29, 2006. (Administrative Record ("AR") at 151-57.) The claim was denied initially on April 10, 2007, and upon reconsideration on August 14, 2007. (*Id.* at 72-76, 81-85.) A hearing was held before an Administrative Law Judge ("ALJ") on March 25, 2009, with Ms. Sproul being represented by counsel. Also appearing and testifying at the hearing were Lawrence Sherman, M.D., an impartial medical expert, and Gloria J. Lasoff, an impartial vocational expert. On July 14, 2009, the ALJ issued an unfavorable decision, finding that Ms. Sproul retained the residual functional capacity to perform a slightly reduced range of exertionally light work, including her past relevant work as property manager or, alternatively, the additional unskilled, light jobs of production inspector, production assembler, or machine packager, and that she therefore was not disabled. (*Id.* at 12-25.) By notice dated March 14, 2011, the Appeals Council denied Ms. Sproul's request to set aside the ALJ's decision. (*Id.* at 1-5.)

**I.     Relevant medical evidence of record**

    A.     <u>Dr. Ansari</u>

Dr. Rashad Ansari was Ms. Sproul's treating rheumatologist. Ms. Sproul first saw Dr. Ansari on November 8, 2006. At that time, Dr. Ansari noted that Ms. Sproul had a history of Grave's disease, and that she came to him with complaints of "sudden onset of severe fatigue and pain all over." (*Id.* at 339-40.) Ms. Sproul described her pain as 7 out of 10 generally, and becoming 9 out of 10 with activity. (*Id.* at 339.) Dr. Ansari noted that Ms. Sproul appeared to move with difficulty, and that her musculoskeletal exam was significant for diffuse hypermobility. (*Id.* at 341-42.) On December 14, 2006, Dr. Ansari noted that Ms. Sproul came to him "angry and in tears" because of her inability to return to work or even drive due to the constant fatigue. (*Id.* at 348.) Medications prescribed during the past two visits were not working. (*Id.*) At this time, Dr. Ansari noted that he would "support disability for one year." (*Id.*)

On March 13, 2009, Dr. Ansari completed a "Fibromyalgia Impairment Questionnaire" as to Ms. Sproul. (*Id.* at 540-45.) In the questionnaire, he noted that in addition to fibromyalgia, Ms. Sproul had been diagnosed with hypermobility, a congenital foot disorder, and a history of Grave's disease. (*Id.* at 540.) He affirmed that she met the American Rheumatological criteria for

1 fibromyalgia, and that the clinical findings consisted of 15 out of 22 tender points, severe pain in
2 the joints, and foot deformity. (*Id.*) Based on the foregoing, Dr. Ansari estimated that, in an eight-
3 hour workday, Ms. Sproul could sit no more than four hours and stand or walk no more than one
4 hour, with the need to get up and move around every hour for five minutes, and lift and carry no
5 more than ten pounds occasionally. (*Id.* at 543.) He estimated she would be incapable of
6 tolerating even a "low stress" work environment, and noted that chronic anxiety was one of her
7 functional limitations. (*Id.* at 544.) He noted that she would need to take unscheduled 10-minute
8 breaks hourly, and that she would likely miss more than three workdays a month. (*Id.*) He also
9 noted the following additional limitations: psychological limitations, and no pushing, pulling,
10 kneeling, bending, or stooping. (*Id.* at 544-45.) Finally, when asked whether he thought Ms.
11 Sproul was a malingerer, Dr. Ansari hand-wrote: "uncertain." (*Id.* at 542.)

12 In a letter dated September 20, 2010, which was after the ALJ's decision in this case, Dr.
13 Ansari affirmed his treatment of Ms. Sproul since November 2006, noted that her symptoms of
14 fatigue have been unrelenting over the past four years, and opined that she remained "completely
15 disabled" by her severe fatigue. (*Id.* at 610.)

16  B.  Dr. Freyne

17 Dr. Brigid Freyne was Ms. Sproul's treating rheumatologist. She first saw Ms. Sproul on
18 January 18, 2007. She noted that Ms. Sproul came to her with complaints of fatigue, poor
19 memory, poor sleep, and tender points present. (*Id.* at 359.) Dr. Freyne's diagnosis was
20 fibromyalgia and hypertension. (*Id.*) Dr. Freyne continued to see Ms. Sproul every month
21 thereafter at least through February 2008. (*See id.* at 393-400, 499-509). In a letter dated April
22 27, 2007, Dr. Freyne affirmed her treatment of Ms. Sproul for fibromyalgia and opined that it
23 rendered her "totally disabled" and "unable to work for the next year." (*Id.* at 391.)

24 On July 9, 2007, Dr. Freyne completed a "Multiple Impairment Questionnaire" as to Ms.
25 Sproul. (*Id.* at 404-11.) She affirmed that Ms. Sproul had fibromyalgia, and listed 18 out of 18
26 tender points as the clinical findings supporting the diagnosis. (*Id.* at 404-05.) She noted that Ms.
27 Sproul had "constant, burning, aching" pain "all over body." (*Id.* at 405.) She opined that, in an
28 eight-hour workday, Ms. Sproul could only sit up to five hours and stand or walk up to one hour a

day, with the need to get up and move around every hour for 10 to 15 minutes. (*Id.* at 406-07.) Dr. Freyne opined that Ms. Sproul could lift or carry no more than five pounds frequently and no more than twenty pounds occasionally, and that she had moderate limitations on her ability to perform fine and gross manipulations and to reach. (*Id.* at 407-08.) She noted that Ms. Sproul's symptoms would frequently interfere with her attention and concentration, that she was incapable of tolerating even a "low stress" environment, and that her symptoms would likely increase in a competitive work environment. (*Id.* at 408-09.) According to Dr. Freyne, Ms. Sproul would likely need to take unscheduled 10 to 15-minute breaks every two to three hours, and she would likely miss more than three workdays a month. (*Id.* at 409-10.) Finally, in response to whether she thought Ms. Sproul was a malingerer, Dr. Freyne responded "no." (*Id.* at 409.)

In February 2008, Ms. Sproul still complained of extreme fatigue, headaches, and muscular pain and stiffness. (*Id.* at 499.) She requested permanent disability from Dr. Freyne and became angry when Dr. Freyne replied that this was "not medically recommended." (*Id.*) At this time, Dr. Freyne also encouraged Ms. Sproul to seek part time work in a low stress environment. (*Id.*)

C.  Dr. Fajerman

Dr. Leon Fajerman was Ms. Sproul's treating psychiatrist. Ms. Sproul obtained mental health treatment from him every two to three months since February 26, 2008. In a letter dated April 15, 2009, Dr. Fajerman opined that the addition of anxiety and sadness to Ms. Sproul's diagnosis of fibromyalgia "creates further limitations in her functioning and capacity to work." (*Id.* at 598.) He noted that Ms. Sproul was "easily overwhelmed" and "insecure." (*Id.*) Based on these symptoms, Dr. Fajerman diagnosed Ms. Sproul as having an anxiety disorder with panic attacks. (*Id.*) On April 15, 2009, Dr. Fajerman also completed a "Psychiatric/Psychological Impairment Questionnaire" as to Ms. Sproul, noting that she suffered from an anxiety disorder with depressive features. (*Id.* at 601-08.) He assessed Ms. Sproul's Global Assessment Functioning ("GAF") at 70.[1] (*Id.* at 601.) He opined that Ms. Sproul was "moderately limited" in

---

[1] The GAF scale reflects a clinician's assessment of the individual's overall level of functioning. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Heath Disorders* 32 (4th ed., text rev. 2000) (hereinafter, "*DSM-IV-TR*"). It takes into account the individual's psychological, social, and occupational functioning, but does not include any impairments

1  her abilities to: maintain attention and concentration; to perform activities within a schedule; to
2  maintain regular attendance and be punctual; to complete a normal work week without
3  interruptions from her psychological symptoms; to perform at a consistent pace without rest
4  periods of unreasonable length and frequency; to interact appropriately with the general public; to
5  accept instructions and respond appropriately to criticism; to get along with co-workers; and to
6  travel to unfamiliar places or use public transportation.  (*Id.* at 604-06.)

### D. Dr. Rodriguez

On March 26, 2007, Ms. Sproul was examined by Dr. Romualdo Rodriguez, a psychiatrist, at the request of the State agency. (*Id.* at 363-69.) Dr. Rodriguez noted that Ms. Sproul's chief complaint to him was regarding depression and anxiety. (*Id.* at 363.) He also noted that she became "briefly tearful in complaining about the chronic pain which she feels doesn't allow her to work anymore." (*Id.* at 364.) In describing Ms. Sproul's daily activity, Dr. Rodriguez indicated that she was able to take care of household chores, cooking, going to the store, and running errands. (*Id.* at 365.) According to Dr. Rodriguez, Ms. Sproul could also take care of self-dressing, bathing, and personal hygiene. (*Id.*) Dr. Rodriguez calculated Ms. Sproul's GAF at 65. (*Id.* at 368.) He opined that Ms. Sproul was able to understand, remember, and carry out simple one or two-step instructions, and to do detailed and complex instructions. (*Id.*) According to him, Ms. Sproul was also minimally limited in her ability to: relate and interact with supervisors, co-workers, and the public; maintain concentration and attention, persistence and pace; associate with day-to-day work activity, including attendance and safety; adapt to stressors common to a normal work environment; maintain regular attendance in the work place and perform work activities on a consistent basis; and perform work activities without special or additional supervision. (*Id.* at 368-69.) According to Dr. Rodriguez, based on his examination, Ms. Sproul also appeared capable of independently managing funds. (*Id.* at 369.)

///

---

in functioning due to physical or environmental limitations. *Id.* A GAF between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." *Id.* at 34.

### E. Dr. Sherman

Dr. Sherman testified as a medical expert at the administrative hearing. He acknowledged that the record reflects that Ms. Sproul suffers from fibromyalgia with the presence of myalgias and arthralgias, together with a history of Graves disease and possible Graves ophthalmopathy. (*Id.* at 47-48.) According to Dr. Sherman, none of these impairments, either individually or in combination, met or equaled any of the Social Security Disability Listings. (*Id.* at 50.) Nonetheless, Dr. Sherman agreed that these impairments imposed limitations on Ms. Sproul's ability to work. (*Id.*) Dr. Sherman opined that Ms. Sproul could lift or carry 20 pounds occasionally, and up to 10 pounds frequently. (*Id.* at 51.) In an eight-hour workday, she could stand, walk, or sit for six hours, with normal breaks. (*Id.*) According to Dr. Sherman, Ms. Sproul's ability to push and pull would be limited in the upper extremities, which would include overhead reaching. (*Id.* at 51-53.) She would also have the following postural limitations: could climb ramps and stairs frequently; no climbing of ladders or ropes; could do balancing frequently; and only occasional stooping, kneeling, and crouching. (*Id.* at 52.)

### F. Vocational expert

Gloria Lasoff testified as a vocational expert at the administrative hearing. Ms. Lasoff opined that Ms. Sproul could still perform the past relevant work of property manager, but not kitchen helper, given the following limitations suggested by the ALJ: (1) able to perform the full range of light work; (2) could not climb ladders, ropes, or scaffolds; (3) could frequently climb ramps or stairs, and could frequently balance; and (4) could only occasionally stoop, kneel, crouch, crawl, or reach overhead. (*Id.* at 62-63.) According to Ms. Lasoff, the skills Ms. Sproul acquired in the property manager job would be transferrable to other managerial positions. (*Id.* at 63.) Ms. Lasoff identified the following three jobs that someone with the above functional limitations could do, with significant number of those jobs available in the regional and national economies: (1) production inspector; (2) production assembler; and (3) machine packager. (*Id.* at 64-66.)

However, when asked to also consider the need to take two additional unscheduled 15-minute breaks during the workday, Ms. Lasoff opined that there would be no jobs available. (*Id.* at 66.) Similarly, Ms. Lasoff opined that there would be no jobs available considering any of the

following additional functional limitations separately: (1) the inability to tolerate even a low degree of work-related stress; (2) missing more than three workdays a month; or (3) inability to remain on-task for up to one-third of the workday. (*Id.* at 66-68.)

## II. Procedural history

On July 14, 2009, the ALJ issued an unfavorable decision, finding that Ms. Sproul retained the residual functional capacity to perform a slightly reduced range of exertionally light work, including her past relevant work as property manager or, alternatively, the additional unskilled, light jobs of production inspector, production assembler, or machine packager, and that she therefore was not disabled. (*Id.* at 12-25.) Specifically, the ALJ made the following findings:

**1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2010.**

**2. The claimant has not engaged in substantial gainful activity since September 29, 2006, the alleged disability onset date (20 CFR 404.1571 *et seq.*).**

**3. The claimant has the following severe impairments: fibromyalgia with myalgogias and arthralgias and status post Grave's disease with probably Grave's ophthalmopathy (20 CFR 404.1520(c)).**

**4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1, Part A (20 CFR 404.1525 and 404.1526).**

**5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except with the following additional limitations: no climbing of ladders, ropes or scaffolds, frequent climbing of ramps and stairs, frequent balancing, occasional stooping, kneeling, crouching and crawling and occasional overhead reaching with either upper extremity.**

**6. The claimant is capable of performing past relevant work as a property manager. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity.**

**7. The claimant has not been under a disability, as defined in the Social Security Act, from September 29, 2006 through the date of this decision (20 CFR 404.1520(f)).**

(*Id.* at 17-24.) By notice dated March 14, 2011, the Appeals Council denied Ms. Sproul's request to set aside the ALJ's decision. (*Id.* at 1-5.)

On May 6, 2011, Ms. Sproul commenced this action for judicial review pursuant to 42

U.S.C. § 405(g). On July 11, 2011, the Commissioner filed his answer and lodged the Administrative Record with the Court. Ms. Sproul filed her motion for summary judgment on October 12, 2011, asserting that the ALJ's decision lacks support of substantial evidence and is based on legal error. Ms. Sproul seeks a remand solely for calculation and award of benefits, or, in the alternative, a remand for a new hearing. On November 8, 2011, the Commissioner filed his opposition as well as his own cross-motion for summary judgment. The Court took the matter under submission without oral argument pursuant to the Civil Local Rule 7.1(d)(1).

## LEGAL STANDARD

To qualify for disability benefits under the SSA, an applicant must show "inability to engage in any substantial gainful activity by reason of any medically determinable impairment that can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The ALJ must follow a five-step sequential evaluation in determining whether the claimant is disabled. *See* 20 C.F.R. § 404.1520. At Step 1, the ALJ asks whether the claimant is presently working in a substantially gainful activity. If so, then the claimant is "not disabled," and the analysis stops. If not, the evaluation proceeds to Step 2, where the ALJ asks whether the claimant's impairment is severe. If not, then the claimant is "not disabled." If yes, the evaluation proceeds to Step 3, where the ALJ asks whether the impairment meets or equals one of a list of specific impairments described in the regulations. If so, the claimant is "disabled." If not, the evaluation proceeds to Step 4, where the ALJ asks whether the claimant has the residual functional capacity ("RFC") to be able to do any past relevant work. If so, then the claimant is "not disabled." If not, the evaluation proceeds to Step 5, where the ALJ asks whether the claimant can do any other work. If not, the claimant is "disabled." If yes, and if the Commissioner can establish there is a significant number of jobs available in the national economy that claimant can perform, then the claimant is "not disabled." *See* 20 C.F.R. § 404.1520; *see also Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1194 (9th Cir. 2004); *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999).

The burden of proof is on the applicant as to Steps 1 through 4, and shifts to the Commissioner at Step 5. *See Tackett*, 180 F.3d at 1098. "If a claimant is found to be 'disabled' or

'not disabled' at any step in the sequence, there is no need to consider subsequent steps." *Id.*

The Commissioner's denial of disability benefits may be set aside only if the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole. *Id.* at 1097. "Substantial evidence" is defined as "'more than a mere scintilla but less than a preponderance.'" *Id.* at 1098 (citation omitted). In determining whether there exists substantial evidence to support the ALJ's finding, the court must weigh both the evidence that supports and the evidence that detracts from the ALJ's conclusion. *Id.* "'If the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ.'" *Id.* (citation omitted).

## DISCUSSION

Ms. Sproul argues the ALJ's decision should be reversed for two reasons. First, she asserts that the ALJ's finding that her mental impairments impose no functional limitations was based on an erroneous rejection of the opinion of Dr. Fajerman, her treating psychiatrist. Second, she contends that the ALJ's finding that she can perform a reduced range of light work was based on an erroneous rejection of the opinions of Dr. Ansari and Dr. Freyne.

As a general matter, opinions of treating physicians are given controlling weight when supported by medically acceptable diagnostic techniques and when not inconsistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2). Where the treating physician's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing" reasons supported by substantial evidence in the record. *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998); *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). Even if the treating physician's opinion is contradicted, the ALJ may not reject it without providing "specific and legitimate reasons" supported by substantial evidence. *Reddick*, 157 F.3d at 725; *Lester*, 81 F.3d at 830. The ALJ must do more than proffer his own conclusions—he must set forth his own interpretations and why they are superior to those of the treating physician. *Embrey v. Bowen*, 849 F.2d 418, 421-22 (9th Cir. 1988). The ALJ may meet this burden by conducting a detailed and thorough discussion of the facts and conflicting evidence, and by explaining his interpretations and findings. *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).

Even if inconsistent with other substantial evidence in the record, the treating physician's

1  opinion is still entitled to deference and must be weighed using the factors provided in 20 C.F.R. §
2  404.1527. *Orn v. Astrue*, 495 F.3d 625, 632-33 (9th Cir. 2007). Those factors include, *inter alia*,
3  the nature and extent of the treating relationship; the length of the treatment relationship and the
4  frequency of examination; the amount of relevant evidence that supports the opinion and the
5  quality of the explanation provided; and the consistency of the medical opinion with the record as
6  a whole. *See* 20 C.F.R. § 404.1527(d)(2)-(6). "'In many cases, a treating source's medical
7  opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the
8  test for controlling weight.'" *Orn*, 495 F.3d at 633 (citation omitted).

### I. Mental impairments

10  The ALJ's finding that Ms. Sproul's mental impairments imposed no functional limitations
11 is supported by substantial evidence. In reaching this conclusion, the ALJ relied on Dr.
12 Rodriguez, the examining psychiatrist, who opined that Ms. Sproul was "able to understand,
13 remember and carry out simple one or two step instructions and do detailed and complex
14 instructions," was "minimally limited" in her ability to relate and interact with others, and was
15 able to maintain concentration, attention, persistence, and pace. (AR at 23; *see also id.* at 368-69.)
16 Dr. Rodriguez's opinion, based on his own examination of Ms. Sproul, is sufficient by itself to
17 support the ALJ's determination that Ms. Sproul's mental impairments imposed no functional
18 limitations. *See Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001) (the examining
19 physician's opinion can alone constitute substantial evidence, where it rests on that physician's
20 own independent examination of the claimant); *see also Allen v. Heckler*, 749 F.2d 577, 579 (9th
21 Cir. 1984) ("[T]o the extent that [the non-treating physician's] opinion rests on objective clinical
22 tests, it must be viewed as substantial evidence that [the claimant] is no longer disabled.").

23  Contrary to Ms. Sproul's argument, the ALJ did not improperly reject the opinion of her
24 treating psychiatrist, Dr. Fajerman. Rather, noting that Dr. Fajerman diagnosed Ms. Sproul with
25 an anxiety disorder with depressive features, the ALJ concluded that those impairments,
26 "considered singly and in combination, d[id] not cause more than minimal limitation in the
27 claimant's ability to perform basic mental work activities" and therefore were not severe. (AR at
28 18.) In reaching this conclusion, the ALJ considered the four broad functional areas set out in the

1  disability regulations for evaluating mental disorders: activities of daily living; social functioning;
2  concentration, persistence, or pace; and episodes of decompensation, (*see* 20 C.F.R. Part 404,
3  Subpart P, App'x 1, § 12.00.C). (AR at 19.) Applying these factors, the ALJ concluded that Ms.
4  Sproul's mental impairments "cause[d] no more than 'mild' limitation in any of the first three
5  functional areas and 'no' episodes of decompression which have been of extended duration in the
6  fourth area." (*Id.*) Ms. Sproul does not contest the ALJ's determination of these factors.

7  In any event, Dr. Fajerman never indicated that Ms. Sproul's mental impairments were
8  sufficiently severe. Rather, Dr. Fajerman concluded that Ms. Sproul's anxiety imposed only
9  "moderate" mental limitations in seven areas of mental functioning. (*See* AR at 604-06.)
10 Moreover, Dr. Fajerman calculated Ms. Sproul's GAF to be 70, which is consistent with Dr.
11 Rodriguez's calculation of 65. (*Compare* AR at 601, *with id.* at 368.) As previously noted, a GAF
12 between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) or
13 some difficulty in social, occupational, or school functioning . . . , but generally functioning pretty
14 well, has some meaningful interpersonal relationships." *DSM-IV-TR*, at 34.

15 For the foregoing reasons, the ALJ's determination that Ms. Sproul's mental impairments
16 imposed no functional limitations is supported by substantial evidence.

17 **II.    Functional limitations**

18 Ms. Sproul next contends the ALJ's finding that she can perform a reduced range of light
19 work was based on the ALJ's erroneous rejection of the opinions of her treating physicians, Dr.
20 Ansari and Dr. Freyne. For the reasons set forth below, the Court agrees.

21 The first reason the ALJ gave for discounting the opinions of Dr. Freyne and Dr. Ansari
22 was that those opinions "appear[ed] on fill-in-the-blank forms with no notes attached to [them]"
23 and "failed to cite any medical testing results or objective observations" in support of their
24 conclusions. (AR at 22.) There is a difference, however, between a conclusory "checklist" and a
25 "fill-in-the-blank" form that also calls for comments from the physician in support of his or her
26 answers. *Compare Batson*, 359 F.3d at 1195 & n.3 (the ALJ properly discounted a treating
27 physician's opinion where it was "in the form of a checklist, did not have supportive objective
28 evidence, was contradicted by other statements and assessments of Batson's medical condition,

1  and was based on Batson's subjective descriptions of pain"), *with Smolen v. Chater*, 80 F.3d 1273,
2  1288 (9th Cir. 1996) (the ALJ improperly rejected treating physicians' responses, which were
3  made as "check-the-box" answers, where "the questions called not only for yes-or-no answers, but
4  also for comments from the physicians in support of their answers").  In this case, because Dr.
5  Ansari's and Dr. Freyne's assessments were each made as part of a questionnaire also calling for
6  substantive comments, rather than simply in a form of a conclusory "checklist," the ALJ erred in
7  discounting these assessments of Ms. Sproul's functional limitations.

8         The "Fibromyalgia Impairment Questionnaire" that Dr. Ansari filled out provided space for
9  him to: (1) list the diagnosed impairments; (2) identify the positive clinical findings and test results
10 supporting those impairments and his diagnosis; (3) list the patient's primary symptoms; and (4)
11 describe the frequency of the patient's pain.  (*See* AR at 540-45.)  In response to the question
12 asking him to "[i]dentify the positive clinical findings," Dr. Ansari wrote that Ms. Sproul was
13 hypermobile, had 15 out of 22 tender points, had severe bilateral pain in her joints, and had foot
14 deformity.  (*Id.* at 540.)  Next, Dr. Ansari identified the following primary symptoms: severe
15 fatigue, sleep dysfunction, and diffuse pain in neck, shoulders, arms, back, and feet.  (*Id.* at 541.)
16 Finally, Dr. Ansari noted that Ms. Sproul had pain "all the time."  (*Id.* at 542.)

17        The "Multiple Impairment Questionnaire" that Dr. Freyne completed similarly provided
18 space for her to: (1) list the diagnosed impairments; (2) identify the positive clinical findings and
19 test results supporting those impairments and her diagnosis; (3) list the patient's primary
20 symptoms; and (4) describe the nature, location, frequency, and the precipitating factors of the
21 patient's pain.  (*Id.* at 404-11.)  Utilizing these questions, Dr. Freyne noted that her diagnosis of
22 fibromyalgia was based on the presence of 18 out of 18 tender points.  (*Id.* at 404-05.)  She also
23 noted that Ms. Sproul's pain was "constant, burning, aching," was "all over body," and was caused
24 by "over-exertion."  (*Id.* at 405-06.)  The ALJ erred in summarily dismissing both of these
25 assessments because they appeared on "fill-in-the-blank" forms.  *See Smolen*, 80 F.3d at 1288 (the
26 ALJ improperly rejected treating physicians' responses made as "check-the-box" answers, where
27 the questions also called for comments from the physicians in support of their answers).

28        Contrary to the ALJ's conclusion, both of the above assessments are also sufficiently

1  supported by medical evidence and objective observations. "'[D]isability may be proved by
2  medically- acceptable clinical diagnoses, as well as by objective laboratory findings.'" *Bilby v.*
3  *Schweiker*, 762 F.2d 716, 719 (9th Cir. 1985) (citation omitted). In this case, both of Ms. Sproul's
4  treating physicians based their diagnosis of fibromyalgia on the presence of tender points and
5  widespread pain. (*See* AR at 404-05, 540–41.) As Ms. Sproul contends, and the Commissioner
6  does not deny, history of widespread pain and tenderness in at least 11 out of 18 tender point sites
7  is sufficient to diagnose fibromyalgia. *See* American College of Rheumatology, 1990 Criteria for
8  the Classification of Fibromyalgia (Excerpt), http://www.rheumatology.org/practice/clinical/
9  classification/fibromyalgia/fibro.asp (last visited February 11, 2012); *see also* Frederick Wolfe et
10 al., *The American College of Rheumatology 1990 Criteria for the Classification of Fibromyalgia:*
11 *Report of the Multicenter Criteria Committee*, 33 ARTHRITIS & RHEUMATISM 160 (February 1990),
12 *available at* http://www.rheumatology.org/practice/clinical/classification/fibromyalgia/
13 1990_Criteria_for_Classification_Fibro.pdf (last visited February 11, 2012). Indeed, the diagnosis
14 of fibromyalgia is *not* contested in this case, seeing as the state's own medical expert, Dr.
15 Sherman, agreed that Ms. Sproul suffered from fibromyalgia. (*See* AR at 47.)
16        In rejecting the opinions of Dr. Freyne and Dr. Ansari, the ALJ also failed to consider the
17 factors set forth in 20 C.F.R. § 404.1527(d)(2)-(6). *See Orn*, 495 F.3d at 632-33 (noting that even
18 if inconsistent with other substantial evidence in the record, the treating physician's opinion is still
19 entitled to deference and must be weighed using the factors provided in 20 C.F.R. § 404.1527).
20 For example, the ALJ did not consider the fact that Dr. Freyne saw Ms. Sproul at least once every
21 month between January 2007 and February 2008, (*see* AR at 393-400, 499-509). *See* 20 C.F.R. §
22 404.1527(d)(2)(i) (length of the treatment relationship is a factor). Neither did the ALJ consider
23 that both of the physicians indicated that in their opinion, Ms. Sproul was totally disabled. (*See*
24 AR at 348 (Dr. Ansari treatment note from December 14, 2006, indicating that he would "support
25 disability for one year"); AR at 391 (Dr. Freyne's letter dated April 27, 2007, affirming her
26 treatment of Ms. Sproul for fibromyalgia and opining that it rendered Ms. Sproul "totally disabled"
27 and "unable to work for the next year").) On the contrary, the ALJ seemed to completely
28 disregard this evidence, noting instead that "[n]one of the claimant's physicians have opined that

1  she is currently totally and permanently disabled from any kind of work." (*Id.* at 20.) The ALJ's
2  failure to offer reasons for completely disregarding the above evidence was legal error.[2] *See*
3  *Smolen*, 80 F.3d at 1286 ("In denying Smolen's application for disabled child's benefits, the ALJ
4  discussed only the opinions Dr. Smolen and Dr. Hoeflich offered in response to four questions
5  Smolen's counsel posed to them; he did not discuss the opinions Dr. Smolen and Dr. Hoeflich
6  offered in other letters. By disregarding those opinions and making contrary findings, he
7  effectively rejected them. His failure to offer reasons for doing so was legal error.").

8  The second reason the ALJ gave for rejecting the opinions of Ms. Sproul's treating
9  physicians is that: "The doctors did not adequately consider the entire record, including the
10  statements of collateral sources and the objective findings of other treating physicians. The
11  objective evidence in the record does not support the level of severity that these doctors assigned."
12  (AR at 22-23.) However, the ALJ failed to specify *what exactly* Dr. Ansari and Dr. Freyne did not
13  consider, or *what specific* "collateral sources" and "objective findings of other treating physicians"
14  he was referring to. As such, the ALJ's opinion is impermissibly vague and conclusory, and
15  therefore does not provide the "specific and legitimate reasons" for rejecting the opinions of Ms.
16  Sproul's treating physicians. *See McAllister v. Sullivan*, 888 F.2d 599, 602 (9th Cir. 1989) ("broad
17  and vague" reasons for rejecting the treating physician's opinions do not suffice); *Embrey*, 849
18  F.2d at 421-22 ("To say that medical opinions are not supported by sufficient objective findings or
19  are contrary to the preponderant conclusions mandated by the objective findings does not achieve
20  the level of specificity our prior cases have required, even when the objective factors are listed
21  seriatim. The ALJ must do more than offer his conclusions. He must set forth his own
22  interpretations and explain why they, rather than the doctors', are correct.").

23  The ALJ's reliance on the opinion of the state medical consultant, Dr. Rose, is equally
24  flawed. The ALJ assigned "significant weight" to Dr. Rose's opinion, who reported that Ms.

---

[2] The fact that in February 2008, Dr. Freyne indicated that it "was not recommended" that Ms. Sproul go on permanent disability, and even encouraged her to seek *part time* work in a low stress environment, (*see* AR 499), does not detract from her earlier conclusion that Ms. Sproul was totally disabled. *See Lester*, 81 F.3d at 833 ("Occasional symptom-free periods—and even the sporadic ability to work—are not inconsistent with disability."); *Holohan v. Massanari*, 246 F.3d 1195, 1205 (9th Cir. 2001) (just because a person makes some improvement does not mean that the person's impairments no longer seriously affect her ability to function in a workplace).

Sproul could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and walk 6 hours and sit about 6 hours in an eight-hour workday; and could occasionally climb ramps and stairs, and occasionally balance, stoop, kneel, crouch, and crawl. (AR at 23.) However, Dr. Rose's opinion is in the checklist form and, as far as the record reveals, provides no support for its conclusions. (*See id.* at 412-16.) The ALJ provided no justification for accepting this "checklist" opinion, while rejecting the fill-in-the-form opinions of Dr. Ansari and Dr. Freyne. Indeed, unlike the questionnaires filled out by Dr. Ansari and Dr. Freyne, which at least contained several questions requiring the physicians to list or explain their respective diagnoses and conclusions, the assessment performed by Dr. Rose is based entirely on check-the-box factors. (*Compare id.* at 412-16 (Dr. Rose), *with id.* at 404-11 (Dr. Freyne), *and id.* at 540-45 (Dr. Ansari).)

Finally, the opinion of the medical expert, Dr. Sherman, does not amount to "substantial evidence" in support of the ALJ's determination. When the non-treating physician relies on the same clinical findings as the treating physician, but differs only in his conclusions, the conclusions of the non-treating physician are not "substantial evidence." *Orn*, 495 F.3d at 632; *see also Murray v. Heckler*, 722 F.2d 499, 501-02 (9th Cir. 1983) (concluding that the ALJ's reliance on the non-treating physician's opinion did not amount to "substantial evidence," where "the *findings* of the non-treating physician were the same as those of the treating physician," and only his *conclusions* differed). "Independent clinical findings can be either (1) diagnoses that differ from those offered by another physician and that are supported by substantial evidence, or (2) findings based on objective medical tests that the treating physician has not herself considered." *Orn*, 495 F.3d at 632. In this case, there is no indication that Dr. Sherman relied on evidence that was not considered by either Dr. Ansari or Dr. Freyne. Rather, Dr. Sherman relied on the same clinical *findings*—i.e., the diagnosis of fibromyalgia with the presence of myalgias and arthralgias and status post Grave's disease with possible ophthalmopathy—in rendering his different *conclusions* as to Ms. Sproul's functional limitations. (*See* AR at 47-53.) Accordingly, these conclusions do not by themselves amount to "substantial evidence." *See Orn*, 495 F.3d at 633 (concluding that where the examining physician "agreed with the diagnoses provided by Orn's treating physicians and offered no alternative diagnosis," and where his opinion "did not rest on results from objective

clinical tests that [the treating physicians] had not considered," the examining physician's "conclusion concerning Orn's ability to stand or walk based on that examination was not an 'independent finding,' and his opinion does not alone constitute substantial evidence to support the rejection of Orn's treating physicians' opinions"); *see also Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) (prohibiting affirmance in Social Security disability cases "simply by isolating a 'specific quantum of supporting evidence'" (citation omitted)).

For the foregoing reasons, the ALJ failed to provide "specific and legitimate reasons" supported by substantial evidence for rejecting the opinions of Ms. Sproul's treating physicians, Dr. Ansari and Dr. Freyne. *See Reddick*, 157 F.3d at 725; *Lester*, 81 F.3d at 830.

## III.    Remedy

The remaining question is whether to remand for further administrative proceedings or for immediate award of benefits. The Court may direct an immediate award of benefits "where the record has been fully developed and where further administrative proceedings would serve no useful purpose." *Smolen*, 80 F.3d at 1292. "In the past, [the Ninth Circuit has] credited evidence and remanded for an award of benefits where (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited." *Id.* (citations omitted); *see also Rodriguez v. Bowen*, 876 F.2d 759, 763 (9th Cir. 1989) (crediting treating physician's uncontroverted testimony and awarding benefits).

In this case, a remand for immediate award of benefits is appropriate. Where the ALJ incorrectly rejects a treating physician's opinion, the Court must credit that opinion "as a matter of law." *Lester*, 81 F.3d at 834. Crediting the opinions of Dr. Freyne and Dr. Ansari means that the Court must also credit their determinations as to Ms. Sproul's functional limitations. Both of them opined that Ms. Sproul would be incapable of tolerating even a "low stress" work environment, would need to take unscheduled 10 to 15-minute breaks hourly, and would likely miss more than three workdays a month. (*See* AR at 544 (Dr. Ansari); 409-10 (Dr. Freyne).) When presented with these additional limitations, the vocational expert testified that *each* one of them *separately*

1  would mean that there would be no job that Ms. Sproul could perform.  (*Id.* at 66-67.)

2  Accordingly, because the ALJ has failed to provide legally sufficient reasons for rejecting
3  the opinions of Ms. Sproul's treating physicians, because there are no outstanding issues that must
4  be resolved before a determination of disability can be made, and because the vocational expert's
5  testimony makes it clear that the ALJ would be required to find Ms. Sproul disabled were the
6  opinions of the treating physicians credited, the Court will remand this case for immediate award
7  of benefits.  *See Smolen*, 80 F.3d at 1292; *Rodriguez*, 876 F.2d at 763.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment is **GRANTED** and Defendant's cross-motion for summary judgment is **DENIED**.  The decision of the ALJ is **REVERSED** and the case is **REMANDED** to the Social Security Administration for a calculation of benefits.  The Clerk of Court shall enter judgment accordingly.

**IT IS SO ORDERED.**

**DATED:  February 17, 2012**

_____
**IRMA E. GONZALEZ, Chief Judge
United States District Court**